# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-60629

MILDRED FITZPATRICK; MARTHA J. FOSTER,

Plaintiffs - Appellants

v.

PONTOTOC COUNTY, MISSISSIPPI,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 4:12-CV-3049

Before KING, SMITH, and ELROD, Circuit Judges.

PER CURIAM:*

Plaintiffs–Appellants Mildred Fitzpatrick and Martha Foster appeal the district court's grant of summary judgment in favor of Defendant–Appellee Pontotoc County, Mississippi, on their federal age discrimination claims. For the following reasons, we REVERSE and REMAND.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-60629

I.

Gary Moorman was elected Chancery Clerk for Pontotoc County, Mississippi, and began his term of office in January 2012.  At that time, there were five deputy clerks working in the Circuit Clerk's office: Mildred Fitzpatrick, Martha Foster, Anita Tutor, Carla Purdon, and Camille "Cami" Lipsey.  During his campaign, Moorman had stated that he planned on keeping all five deputy clerks were he to take office.

After he took office, however, Moorman claims that he began to encounter problems with the staff.  He purports that his primary concerns were unsupportiveness and what he terms "disloyalty," but he also claims he was concerned with excessive use of office computers for personal purposes, rude customer service, and tardiness.  Moorman also encountered a specific problem with Cami Lipsey.

On the morning of September 5, 2012, Moorman received a call from the court administrator's office, informing Moorman that the clerk's office had not disposed of a court case dating from July 2011.  Lipsey was responsible for dealing with matters related to the courts.  Moorman claims that when he went to speak with Lipsey about the call, he noticed that there were numerous other cases of which she had not disposed.  Upset, Moorman called Lipsey into his office to discuss her failure to handle the cases.

Fitzpatrick entered Moorman's office after he had spoken with Lipsey. Moorman told Fitzpatrick that he had concerns with Lipsey's performance and that he was considering firing her.  He asked Fitzpatrick whether she thought that Lipsey was able to do her job, and Fitzpatrick responded that she could. After discussing Lipsey, Moorman asked Fitzpatrick why she did not retire. Fitzpatrick told Moorman that she had done a pre-application and that she could not live on the pension that she would draw.  Fitzpatrick mentioned that one of her major concerns was health insurance.

No. 14-60629

Moorman testified that, at the end of the day on September 5, he spoke to the entire staff about some of his concerns with their performance. Moorman purportedly told the staff that he was going to put in a time clock because of tardiness, that he was going to have all computer games removed from the office computers, that he wanted them to stop using their phones to access social media websites, and that he wanted "all the gossiping" to stop.

Moorman came in the next day and, before Fitzpatrick had arrived for work, told Foster that he had worked up a retirement package for Fitzpatrick, Foster, and Tutor.[1]   Foster told Moorman that she did not want to retire and did not want a retirement package.   When Fitzpatrick arrived, Moorman explained to her that he and his wife had drawn up a plan for Fitzpatrick, Foster, and Tutor to retire.   Moorman told her that she could retire, but continue to do payroll work part-time (thereby maintaining her health insurance coverage).   Fitzpatrick became very upset and told Moorman that she did not want to retire and could not afford to retire, and she began crying.[2] Fitzpatrick's husband came in and spoke to Moorman, and Moorman agreed to let the retirement plan drop and carry on as before.   Fitzpatrick claims that she was so upset, her blood pressure spiked and she went to the hospital.

That weekend, Moorman claims he was told by Lisa Baggett that Foster had remarked to another member of the community that Moorman was not a

---

[1] This contradicts Moorman's account.  He testified that he drew up a retirement plan for Tutor only after he heard that she was upset that a plan had been offered to Fitzpatrick and Foster but not her.  Further, Moorman claims that he did not approach Foster about a retirement package until *after* he had offered the package to Fitzpatrick.

[2] Moorman describes the conversation differently:

> Okay.  While I was telling Mildred about this plan -- you know, I was really excited about it, and I was telling her about it, and Ms. Foster started saying, you just want to run us off.  You just want to force us into retirement.  You just want to -- you know, you just want us gone.  Well, when she started saying that then Ms. Fitzpatrick started getting upset.  And so it frustrated me, and so I said, well, you know, the deal is off the table.  Just forget it.

No. 14-60629

man of his word and that he was incompetent. That Sunday, Moorman drew up a document listing his concerns with the staff's performance. The document included a space for each deputy clerk to sign, indicating her acceptance of its terms. Moorman claims that he intended to meet with the deputy clerks on Monday morning and present them with the changes he wanted made. He testified that he eventually decided it would be futile to do so because he could not trust them.

On Monday morning, Moorman met with all of the members of the county board of supervisors, discussed the problems with his staff, and sought approval to terminate the deputy clerks (though his mind was still, apparently, not made up). Later Monday morning, Moorman met with all of the deputy clerks present that day—Fitzpatrick was still out sick on the orders of her physician—and fired them all. At the time of their firing, the ages of the deputy clerks, with the approximate number of years each worked for the chancery clerk's office in parentheses, were as follows:

    (1) Fitzpatrick—51 years old (35 years)
    (2) Tutor—59 years old  (18 years)
    (3) Foster—64 years old (10 years)
    (4) Lipsey—43 years old (16 years)
    (5) Purdon—39 years old (5 years)

Fitzpatrick was replaced by Maggie Patrick, who was twenty-nine years old at the time she was hired. Foster was replaced by Cathy Purdon, who was forty-four years old at the time she was hired. The remaining new-hires were aged forty-eight, forty-seven, and thirty-eight years.

Fitzpatrick and Foster then filed suit against Pontotoc County in the United States District Court for the Northern District of Mississippi, alleging unlawful age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). The district court granted summary judgment in favor of Pontotoc County. Appellants timely appealed.

No. 14-60629

II.

A district court's grant of summary judgment is reviewed de novo, "construing all facts and evidence in the light most favorable to the non-moving party." *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, "[t]he Court must 'draw all reasonable inferences in favor of the nonmoving party' and 'refrain from making credibility determinations or weighing the evidence.'" *Celtic Marine Corp. v. James C. Justice Cos.*, 760 F.3d 477, 481 (5th Cir. 2014) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). That said, "[a] party cannot 'defeat summary judgment with conclusory allegations, unsubstantiated assertions, or "only a scintilla of evidence."'" *Id.* (quoting *Turner*, 476 F.3d at 343).

III.

"The ADEA broadly prohibits arbitrary discrimination in the workplace based on age." *Lorillard v. Pons*, 434 U.S. 575, 577 (1978). The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes," namely, the stereotype that "productivity and competence decline with old age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Because of the ADEA's proscriptions, "[t]he employer cannot rely on age as a proxy for an employee's

remaining characteristics, such as productivity, but must instead focus on those factors directly." *Id.* at 611.

"To establish an ADEA claim, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.'" *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (alteration in original) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). If the plaintiff elects to make his ADEA case by the use of circumstantial evidence, this court applies the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010). Under the *McDonnell Douglas* framework, the plaintiff "must first establish a prima facie case of age discrimination." *Squyres v. Heico Cos.*, 782 F.3d 224, 231 (5th Cir. 2015).[3] If the plaintiff "meets his initial burden, the burden of production shifts to his employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision." *Id.* "At this stage, the employer's burden is one of 'production, not persuasion,' and 'involve[s] no credibility assessment.'" *Id.* (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the employer meets this burden by articulating a non-discriminatory justification, "the presumption raised by the prima facie case is rebutted and drops from the case." *Id.* (internal quotation marks omitted). The burden then shifts back to the plaintiff to "rebut the employer's purported

---

[3] The prima facie case requires a plaintiff to show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)).

explanation, to show that the reason given is merely pretextual." *Moss*, 610 F.3d at 922.

"A plaintiff may show pretext 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is "false or unworthy of credence."'" *Jackson*, 602 F.3d at 378–79 (quoting *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). Evidence that an employer's proffered non-discriminatory explanation is false is "circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. "In determining whether the plaintiff's rebuttal precludes summary judgment, '[t]he question is whether [the plaintiff] has shown that there is a genuine issue of material fact as to whether this reason was pretextual.'" *Moss*, 610 F.3d at 922 (quoting *Jackson*, 602 F.3d at 378).

Pontotoc County does not dispute that Appellants have made a prima facie case of age discrimination. Pontotoc County put forward Appellants' purported disloyalty as its non-discriminatory justification for terminating Appellants. Appellants therefore have the burden of establishing a genuine dispute of material fact as to pretext. Given the record in this case, Appellants have carried their burden, and the district court erred in granting summary judgment.

First, Pontotoc County's evidence that Appellants were disloyal is weak. Moorman pointed to Foster's statements on the Friday before she was terminated that Moorman was incompetent and not a man of his word. But that is the only specific example of disloyalty that Moorman could put forward. In his deposition, Moorman was asked specifically about issues with Fitzpatrick's loyalty:

Q.     What did they do which led you to believe that they weren't loyal?

A.     Different people in the community would tell me things that were being said about my competency and my -- what's the word?  I hate to say that they just called me a liar, but my --

Q.     Well, tell me specifically what those people told you.  And give me the first person first.

A.     The first person?

Q.     Yes.

A.     And we're talking which employee?

Q.     You're talking -- we're talking about Ms. Fitzpatrick right now.

A.     Okay.

Q.     Did anybody in the community say anything about her being disloyal or disrespectful about you?

A.     No.

Q.     Okay.  So that's only going to be Ms. Foster, is that correct?

A.     Uh-huh (Indicating yes).  Ms. Foster.

This testimony is inconsistent with Moorman's non-discriminatory justification of "disloyalty" as to Fitzpatrick.  Another example Moorman gives of purported disloyalty was that an elected official, Van McWhirter, told him "just to be careful cause everybody wasn't [Moorman's] friend" and "[t]hat everybody wasn't on [Moorman's] side."  McWhirter apparently did not specify who wasn't on Moorman's "side."  Though Moorman, in his deposition, pointed to further reasons he felt his staff was disloyal, his descriptions of the offending behavior are general and devoid of particulars.  Moorman admitted that the only negative statement about him of which he was aware was Foster's comment to Lisa Baggett about his not being a man of his word and being incompetent.  The lack of specific examples of "disloyalty," aside from the one incident on the part of Foster, undermines Moorman's purported non-discriminatory justification, especially as to the other four deputy clerks.

Those infirmities are compounded by the circumstances of Moorman's discussion of retirement with Appellants.  Moorman suggested retirement to

Fitzpatrick and Foster before Foster made—and Moorman heard—the comment about his not being a man of his word.[4]  Given that this was the only specific incident suggesting disloyalty that Moorman could point to on the part of any of his clerks, a jury could potentially infer from this chronology that Moorman wanted to get rid of Appellants before he was aware of this comment. If Moorman had resolved to end Appellants' employment before he had heard about Foster's statement, a jury could infer that his proffered non-discriminatory justification was a mere post-hoc rationalization.  Moorman also stated in his affidavit that none of the retirement discussions "had anything to do with my decision to terminate the employment of the deputy clerks in my office."  The suggestion that it is merely coincidental that Moorman offered retirement to three deputy clerks four days before he fired them could be taken by a jury to further erode Moorman's veracity.

Further, Lipsey's deposition testimony lends some additional support to Appellants' showing of pretext.  During Lipsey's deposition, she testified as to an exchange with Moorman:

> Q.    Did you ever hear Mr. Moorman make any comments about wanting to get rid of or replace the older employees and keep the younger ones there?
> A.    Yes.
> Q.    Tell me what you heard him say.
> A.    It was actually the day that Mr. Moorman called me in the office to fire me, just me, and he told me that I was actually his best employee, and he couldn't understand why I wasn't doing the job.  And he said, what I want to do is keep you and Carla, but I would like to, you know, get my own people in here.  And he said, keep you and Carla and get rid of the other ones.
> Q.    So he wanted to get rid of the three older ones?
> A.    Yes.

---

[4] In fact, it was his suggestion of retirement that prompted Foster to make that comment, given his campaign promise to retain all five deputy clerks.

Given the paucity of evidence supporting any sort of "disloyalty" on the part of Purdon or Lipsey, a reasonable jury could potentially infer that they were fired as a cover for unlawful age discrimination against Appellants.[5]

The evidence in this case is undoubtedly thin on both sides. Yet at the summary judgment stage, the defendant has the burden of showing that there is no genuine dispute of material fact, and all evidence is viewed in the light most favorable to the non-moving party. Given the weaknesses in the evidence supporting Pontotoc County's purported non-discriminatory justification, Appellants' evidence suggesting pretext, combined with their prima facie case, is sufficient to preclude summary judgment. Resolution of this case will largely turn on credibility determinations, with regard to both Pontotoc County's and Appellants' witnesses. The district court, in granting summary judgment, appears to have drawn several of those conclusions as to credibility itself. While a jury may ultimately reach those same conclusions, assessments of

---

[5] Pontotoc County also argues that the "same actor" inference should apply in its favor. "The 'same actor' inference arises when the individual who allegedly discriminated against the plaintiff was the same individual who hired the plaintiff and gives rise to an inference that discrimination was not the motive behind plaintiff's termination." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n.16 (5th Cir. 2000). The inference arises because "[c]laims that employer animus exists in termination but not in hiring seem irrational" as it "hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (alteration in original) (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)), *abrogated on other grounds by Reeves*, 530 U.S. 133. The same actor inference likely does not apply on the facts of this case. First, Pontotoc County cites no case in which the decision to retain an employee—rather than a decision to hire him—is sufficient to trigger the inference. *But cf. Sreeram v. La. State Med. Ctr.-Shreveport*, 188 F.3d 314, 321 (5th Cir. 1999) (applying the inference and affirming summary judgment where a decision-maker rejected a committee's recommendation that he terminate the plaintiff). Second, there is a plausible explanation for the inconsistency that the jury could accept, namely, Moorman's campaign promise to retain and work with the then-employed deputy clerks. *See Russell*, 235 F.3d at 228 n.16 ("Further, we also note that the 'same actor' inference does 'not rule out the possibility that an individual could prove a case of discrimination.'" (quoting *Brown*, 82 F.3d at 658)).

No. 14-60629

credibility are not appropriately drawn by the court at the summary judgment stage.[6]

## IV.

Accordingly, the judgment of the district court is REVERSED, and the case is REMANDED to the district court.

---

[6] We of course express no view on the ultimate merits of this case once it is submitted to a trier of fact.